IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
4:11-CR-4-FL-1

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | **MEMORANDUM AND** |
| ) | **RECOMMENDATION** |
| DELVON DONTE MASSENBERG, ) | |
| ) | |
| Defendant. ) | |

This case comes before the court on defendant's motion to suppress (D.E. 20). In support of his motion, defendant has filed three memoranda, one included in his motion (D.E. 20) and two supplemental memoranda (D.E. 31, 35). The government filed a memorandum (D.E. 22) and two supplemental memoranda (D.E. 30, 34). The motion was referred to the undersigned for an evidentiary hearing and a memorandum and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (*See* 28 Mar. 2011 Docket Entry immediately following D.E. 22). For the reasons stated below, it will be recommended that defendant's motion be denied.

## PROCEDURAL BACKGROUND

On 25 August 2009, defendant was charged by complaint with the offense of possession of a firearm (*i.e.*, a 9 millimeter pistol) by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924. He was subsequently indicted for this offense on 26 January 2011. (D.E. 9).

On 16 March 2011, defendant filed the instant motion to suppress. The motion seeks suppression of all evidence taken during and derivative from a traffic stop that led to the charge against defendant, including the statements made by defendant to police after his arrest. On 7 April 2011, the undersigned conducted an evidentiary hearing on defendant's motion. (D.E. 25).

At the hearing, the government presented the testimony of the police officer effecting the traffic stop, Joseph Puhak ("Puhak"). The court admitted the two exhibits offered by the government without objection by defendant, as follows: the firearm found during the search of defendant's vehicle (Gov.'s Hrg. Ex. 1); and a DVD video recording of the traffic stop ("Video") and adjacent time periods taken by the camera in Puhak's patrol car (Gov.'s Hrg. Ex. 2). The entire Video was shown as part of its direct examination of Puhak. Portions of the Video were shown again during the cross-examination of Puhak.

## FINDINGS OF FACT

After careful consideration of all the evidence of record on defendant's motion, the court makes the following findings of fact:

## I. THE TRAFFIC STOP

At all times relevant to defendant's motion, Puhak was an officer with the Roanoke Rapids Police Department and was assigned to the Advanced Criminal Enforcement Unit. (Transcript of Hearing ("Tr.") (D.E. 27) 4:23 to 6:3; 15:11 to 16:18; 20:4-10; 22:6-11). On 6 April 2009, Puhak was patrolling a portion of Interstate 95 ("I-95") within the city limits of Roanoke Rapids, North Carolina in a marked patrol car. (Tr. 20:4-19). The ground was damp from an earlier rain. (Tr. 21:4-7). At approximately 12:35 p.m., Puhak was parked on the side of I-95 monitoring northbound traffic. (Tr. 21:22 to 22:2; 77:15-22). Puhak observed a black Cadillac Escalade SUV ("SUV") traveling in the left lane make a sudden change into the right lane and begin following a smaller SUV closely, at a distance of approximately one and a half car lengths. (Tr. 22:1-25; 24:20-22). Puhak was trained that the proper following distance is approximately one car length for every ten miles per hour of speed. (Tr. 26:12-18). Puhak also had an agreement with his partner in his patrol unit that this was the measure that would be used

to determine whether a driver was violating the prohibition against following at an unsafe distance. (*Id.*)

On the basis of these observations, Puhak began a pursuit of the SUV. (Tr. 23:9-20). As he was trained to do, Puhak pulled up alongside the SUV in the left lane to gather additional information for his investigation and for safety reasons before initiating a traffic stop. (Tr. 23:16-20). Specifically, Puhak performs this additional observation to determine how many occupants are in the vehicle, whether they are wearing their seat belts, and, in the event that the vehicle attempts to flee, whether any children are present. (Tr. 23:16-20; 116:3-23). Because the SUV's tinted windows prevented Puhak from seeing into the back passenger area of the vehicle, he was able to observe only the driver. (Tr. 23:17 to 24:5).

Puhak estimated that the SUV was travelling at 70 miles per hour. (Tr. 26:2-9). He made this estimate by pacing the SUV–that is, matching the SUV's speed and then reading the speed off his own speedometer. (Tr. 26:5-9).

While Puhak's patrol car was beside the SUV, Puhak observed the driver slouched behind the "B pillar," which is the portion of the car adjacent to the window to which the seat is mounted. (Tr. 12:16-19; 24:6-11). The driver did not make eye contact with Puhak. (Tr. 24:10-12). Puhak then slowed his vehicle so that he could see the rear of the SUV to run its registration. (Tr. 24:13-15). At this point, Puhak decided that he would stop the SUV for the violation of following another vehicle too closely. (Tr. 24:16-17).

As Puhak traveled in the left lane with the SUV ahead of him in the right lane, the SUV moved from the right lane to the left lane, pulling in front of Puhak. (Tr. 29:8-12). The SUV came within three quarters of a car length behind the vehicle it was following in the right lane before moving into the left lane. (Tr. 29:13-16). The SUV then passed the vehicle it had been

following, moved back into the right lane, and exited the interstate. (Tr. 29:17-20). The exit taken by the SUV was the first exit available after Puhak began following the SUV. (Tr. 29:21-25). Puhak, following the SUV, initiated the traffic stop on the exit ramp, and the SUV pulled off on to the side of the road on the ramp. (Tr. 30:1-13).

## II. SEIZURE OF THE MARIJUANA BLUNT AND DEFENDANT'S ARREST

After stopping the SUV, Puhak exited his patrol car and approached the vehicle on the passenger's side. (Tr. 30:22 to 31:1). As he approached, he visually scanned the interior of the vehicle and observed an infant in the center of the back seat in an infant car seat. (Tr. 31:5-9). Puhak then approached the passenger door and scanned the interior of the vehicle as he introduced himself to the driver, defendant. (Tr. 31:12-21). Puhak's introduction was interrupted by defendant's constant chatter, and Puhak noted that defendant was overly friendly. (Tr. 31:18-22). As he was speaking with defendant, Puhak observed what he believed to be a marijuana "blunt," or a cigar rolled with a tobacco leaf wrapping that contains marijuana instead of tobacco, resting unobstructed from view on the center console to the right of the driver's seat. (Tr. 31:22 to 32:1; 35:22 to 36:2). While continuing his conversation with defendant, Puhak reached into the vehicle, picked up the blunt, observed it, and placed it behind his ear. (Tr. 32:14-19). He then asked defendant to step out of the vehicle. (Tr. 32:19-20). As Puhak was walking around the back of defendant's vehicle to meet defendant on the driver's side, Puhak stopped in front of his patrol car and placed the blunt on the hood in front of the video camera in his patrol car, which was recording the stop. (Tr. 32:20 to 33:4).

Puhak then approached the driver's side of the SUV and waited for defendant to exit. (Tr. 37:16-19). Immediately after he got out of the vehicle, defendant re-entered the vehicle through the driver's side rear door and went into the back seat where his infant daughter was

4

seated. (Tr. 37:19-25). Puhak then observed defendant rummaging around the infant car seat. (Tr. 38:4-11). Although Puhak generally does not allow a person to go back into a vehicle for safety reasons, he was trying to be accommodating to defendant's need to tend to his daughter. (Tr. 38:12-22). Because Puhak was unable to adequately observe defendant's actions from outside of the vehicle, Puhak repositioned himself so that he could observe defendant through the open front driver's side door. (Tr. 38:23 to 39:6). Defendant then handed the infant car seat containing the child to Puhak through the space over the console between the driver and the passenger seat. (Tr. 39:6-9). Puhak took the child out through the front driver's side door and, as Puhak was trying to find a secure place to put the infant, defendant handed Puhak the base of the infant car seat which defendant also had removed from the SUV. (Tr. 39:9-18; 40:7-19). Puhak then placed the infant car seat and the base on the ground next to the front of the patrol car on the passenger's side. (Tr. 39:19-25; 40:18-19).

After securing the infant, Puhak noticed that defendant had gone back into the vehicle. (Tr. 40:1-3). Defendant then exited the vehicle and walked toward the back of it while appearing to "frisk" himself. (Tr. 40:2-6, 24-25). Defendant continued walking around the back of the vehicle to the passenger's side of the vehicle, "dug around in his waistband and pockets," and entered the rear passenger's side door. (Tr. 40:7 to 41:7). At this point, Puhak directed defendant to return to the back of the vehicle where Puhak performed a search of defendant's person. (Tr. 41:8-20). During the search, Puhak discovered $2,300.00 in cash in defendant's left pants pocket and $50.00 in cash and a "blunt splitter" in his right pants pocket. (Tr. 42:6 to 44:1). A "blunt splitter" is a tool containing a razor which is used to split the paper of a cigar so that the tobacco can be removed and replaced with marijuana or other narcotics. (Tr. 44:2-12).

5

Puhak seized the items found in the search, placed defendant in handcuffs, and waited for back-up officers to arrive. (Tr. 45:5-16). Following the arrival of back-up, Puhak placed the infant and car seat into the back seat of his patrol car. (Tr. 45:18 to 46:5; 66:11-21). As he did so, he noticed that she smelled like raw marijuana. (*Id.*). Puhak then inspected the infant car seat to determine if marijuana was concealed somewhere in it. (Tr. 46:18-25).

### III. THE SEARCH OF THE SUV

Puhak then searched defendant's vehicle. (Tr. 47:15-20). During the search, he found a loaded, 9 millimeter semi-automatic pistol tucked into a crease in the seat beneath the area where the infant car seat had been. (Tr. 47:21 to 49:23). Puhak also found a box of plastic sandwich bags and a can of "blunt spray," which is a highly concentrated air freshener often used by narcotics traffickers to deter law enforcement officers or drug sniffing canines from the odor of narcotics. (Tr. 52:7-22).

### IV. DEFENDANT'S STATEMENTS

After completing the search of the SUV and discussing the investigation with other officers at the scene, Puhak entered his vehicle with defendant in it and advised defendant of his *Miranda* rights. (Tr. 53:13-23). Puhak then drove defendant to the police department. (Tr. 54:3-9). During the drive, defendant admitted that the marijuana blunt was his, but denied knowledge and possession of the gun. (Tr. 54:14 to 55:5).

### **DISCUSSION**

By his motion, defendant seeks suppression of all evidence obtained as a result of the search of his vehicle and his person, including his statements to Puhak following his arrest. Defendant's principal challenges to the search are that: (1) Puhak did not have probable cause for the traffic stop; (2) he exceeded the lawful scope of the traffic stop when he reached into the

vehicle to pick up the marijuana blunt; and (3) his decision to stop defendant was based on race in violation of the Equal Protection Clause of the Fifth Amendment. The court will examine each of the defendant's contentions in turn below.

I.  **THE TRAFFIC STOP**

   A.  **Applicable Law**

"A traffic stop of a vehicle constitutes a seizure within the meaning of the Fourth Amendment and is permissible if the officer has either probable cause to believe a traffic violation has occurred, *Whren v. United States*, 517 U.S. 806, 809–10 (1996), or a reasonable suspicion of unlawful conduct, *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)." *United States v. Ohangbon*, No. 10-4957, 2011 WL 2356781, at *1 (4th Cir. 14 June 2011). "Observation of any traffic violation, no matter how minor, gives an officer probable cause to stop the driver." *United States v. Hammond*, 353 Fed. Appx. 877, 878 (4th Cir. 2009). Further, "[a] stop for a traffic violation 'does not become unreasonable merely because the officer has intuitive suspicions that the occupants of the car are engaged in some sort of criminal activity.'" *Id.* (quoting *United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993)).

   B.  **Analysis**

Defendant asserts that the traffic stop was unlawful on the grounds that Puhak did not have probable cause to believe that defendant had committed a traffic violation. The court finds defendant's argument completely without merit.

Puhak testified that he stopped defendant for violating the North Carolina law requiring motorists to maintain a safe following distance. The statute, N.C. Gen. Stat. § 20-152, provides in relevant part as follows: "The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the

7

traffic upon and the condition of the highway." N.C. Gen. Stat. § 20-152(a). While this statute does not provide a specific measure of safe distance, Puhak testified that he was taught and applies the rule that a safe distance is approximately one car length for every ten miles per hour of speed. He determined defendant to be violating this rule and thereby the statute.

Defendant counters that this rule of thumb is unreasonable. He argues specifically that "common experience traveling on interstates cannot support the fact that many drivers, if any at all, follow Officer Puhak's 'rule of thumb.'" (Supp. Mot. 4). In support of his argument, he points to portions of the Video covering the period shortly before the stop of defendant's vehicle showing that other drivers not stopped by Puhak were violating this rule. (*See* Video 12:43:23 to 12:44:19[1]). Indeed, defendant argues that Puhak himself violated this rule in the course of his pursuit of defendant. Defendant also asserts that Puhak's determination that defendant had violated the law was based on Puhak's inaccurate statement that the ground was damp from an earlier rain. Defendant contends that the Video shows that the road was dry. (*See* Video, *e.g.*, 12:42:50 to 12:44:20).

Defendant has failed to show that the rule of thumb Puhak followed was unreasonable as applied to him. Here, the rule holds that defendant should have been following the vehicle ahead of him by substantially more than one and a half car lengths–the following distance upon which Puhak based his decision to stop defendant's SUV. It was patently reasonable for Puhak to determine that such a short following distance was not "reasonable and prudent" given the 70 mile per hour speed at which defendant was travelling, equivalent to over 102 feet per second.[2]

---

[1] All citations to the Video will be to the actual time of day in 24-hour or "military" format appearing in the upper right corner of the video image.

[2] This figure is calculated as follows: 5,280 feet per mile x 70 m.p.h. = 369,600 feet; 369,600 feet ÷ 3,600 seconds per hour = 102.667 feet per second.

8

This is decidedly not a case at the fringes of the rule of thumb, involving, say, a following distance of six versus seven car lengths at 70 miles per hour.

Further, the rule applied by Puhak finds support in the law. In *United States v. Flores Duran*, the court addressed the same issue presented here with respect to an identical South Carolina traffic law[3] and concluded as follows:

> The Court notes that the South Carolina statute's "reasonable and prudent" language does place great discretion in the hands of law enforcement officers and requires them to make a subjective judgment call as to whether a vehicle is following another too closely. However, the Court also believes that using an agency rule of thumb that a safe following distance consists of one car length for every ten miles per hour of speed that a vehicle is traveling is a perfectly reasonable way for an officer to make such a subjective determination.

*United States v. Flores-Duran*, No. 7:10-CR-00095-FL, 2011 WL 780592, at *4 (E.D.N.C. 2011), Mem. & Rec. *adopted by* 2011 WL 780172 (E.D.N.C. 28 Feb. 2011); *see also State v. Wilson*, 155 N.C. App. 89, 95, 574 S.E.2d 93, 98 (2002) (holding that an officer had probable cause to stop defendant for a violation of N.C. Gen. Stat. § 20-152(a) where defendant was "traveling behind another vehicle at a distance of less than one car length and at a speed of sixty-nine miles per hour").

With respect to other vehicles that were not complying with the rule of thumb Puhak followed, defendant cannot seriously contend that he should not be held accountable for violation of a traffic law because others routinely violate it or that an officer is required to stop each and every vehicle he encounters that is violating a traffic law. Moreover, Puhak was not patrolling the interstate solely for the purpose of enforcing traffic laws, but rather was assigned to the Advanced Criminal Enforcement Unit, the purpose of which was to detect crimes, such as drug trafficking committed via the interstate. (Tr. 15:11 to 16:18; 20:4-10; 22:6-11). As for Puhak's

---

[3] The South Carolina statute also provides that "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway." S.C. Code Ann. § 56-5-1930(a) (1976).

9

own driving behavior, he testified that his law enforcement training allows him to follow more closely in the apprehension of violators and that he was following defendant closely in order to make observations for his investigation. (Tr. 87:1-7). Indeed, given a law enforcement officer's specialized training, the "reasonable and prudent" following distance would arguably be different for Puhak than for a civilian without specialized training.

Finally, despite defendant's contention that the Video shows that the road was dry, there are, as the government contends, visual indications of moisture in darkened areas in the middle and on the side of the roadway (*see* Video 12:43:28 to 12:43:35; 12:44:21 to 12:44:25) as well as standing water on the side of the road at the location of the stop (*see* Video 12:44:34 to 12:44:46) that corroborate Puhak's testimony that the ground was damp from an earlier rain. In any event, Puhak expressly stated that he would have found defendant's driving behavior to be in violation even under dry road conditions. (Tr. 26:25 to 27:6).

The court concludes that Puhak had probable cause to stop defendant for following another vehicle too closely in violation of N.C. Gen. Stat. § 20-152(a). Accordingly, this ground for the motion to suppress should be rejected.

## II.     SEIZURE OF THE MARIJUANA BLUNT

### A.     Applicable Law

Even where a traffic stop is valid at its inception, it must be "'reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Rusher*, 966 F.2d 868, 875 (1992) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). The proper investigative scope for a routine traffic stop entails the officer's requesting a driver's license and vehicle registration, running a computer check, and issuing a citation. *Id.* at 876 (citing *United States v. Guzman*, 864 F.2d 1512, 1519 (10th Cir. 1988)). If the driver produces a valid license

10

Case 4:11-cr-00004-BR   Document 38   Filed 07/19/11   Page 10 of 19

and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without further detention, "unless the officer has a reasonable suspicion of a serious crime." *Id.* at 876-77.

The Fourth Amendment requires that searches and seizures of property in the course of a traffic stop, or otherwise, be conducted pursuant to a warrant or fall within an exception to the warrant requirement. *See United States v. Bush*, 404 F.3d 263, 275 (4th Cir. 2005) (holding that a warrantless search is unreasonable under the Fourth Amendment unless within an exception to the warrant requirement). One such exception permits the warrantless seizure of property in plain view. "[I]f, while lawfully engaged in an activity in a particular place, police officers perceive a suspicious object, they may seize it immediately." *Brown*, 460 U.S. at 739. For this exception, the plain view doctrine, to apply, the government must show that: "(1) an officer is legitimately in position to view an object, (2) the evidence is discovered inadvertently, and (3) the incriminating nature of the evidence is immediately apparent." *Cuthrell v. Truelove*, No. 85-6232, 1987 WL 37007, at *3 (4th Cir. 25 Mar. 1987) (citing *Texas v. Brown*, 460 U.S. 730, 737 (1983)).

**B.     Analysis**

Defendant contends that Puhak exceeded the proper scope of the traffic stop when he reached in through the open front passenger window and picked up what he believed to be a marijuana blunt. Defendant characterizes Puhak's action as a warrantless seizure unsupported by probable cause. He disputes specifically the government's contention that Puhak's seizure of the blunt was within the "plain view" exception to the warrant requirement, arguing that the first and third requirements of the exception are not met. The court disagrees with defendant.

11

Case 4:11-cr-00004-BR   Document 38   Filed 07/19/11   Page 11 of 19

With respect to the first requirement–that the officer is legitimately in a position to view the object ultimately seized–defendant asserts that Puhak "did not observe what he asserted were the distinguishing characteristics of a marijuana blunt wrapped in a normal cigar tobacco leaf until after he had reached in the car and taken the object from the center console." (Supp. Mot. 7). Defendant cites to the following statement as support for his contention that Puhak did not believe the object was a marijuana blunt until after he retrieved it from inside the vehicle: "I just reached in. The video depicted me reaching in and grabbing it. And I observed it and kept conversation with him and put it behind my ear . . . ." (Tr. 32:16-18).

But before making this statement, Puhak testified that he "observed one marijuana blunt on the center console of the vehicle" while "he was having general, polite conversation" with defendant (Tr. 31:22-25) and that "as soon as I introduced myself, I reached in seconds later because that is when I observed it." (Tr. 33:17-19). Puhak also specifically testified that he did not "lean [his] upper torso inside the vehicle before [he] saw the marijuana blunt." (Tr. 34:6-8). Even more specifically, Puhak testified that "it looked like a marijuana blunt" at the time he was observing it sitting inside the vehicle. (Tr. 35:22 to 36:2). Thus, the evidence demonstrates that Puhak saw what he believed to be a marijuana blunt before he reached into the vehicle to pick it up. Accordingly, in satisfaction of the first requirement of the plain view doctrine, Puhak observed the contraband from a place he had a lawful right to be–that is, outside of the SUV speaking to defendant about the traffic stop.

The parties do not contest the second requirement, namely, that the evidence in question, the blunt, was discovered inadvertently. The court agrees. Puhak came across it in advertently in the course of the traffic stop.

As to the third requirement–that the incriminating nature of the evidence was immediately apparent–defendant contends that the Puhak did not have probable cause to believe that what he observed was a marijuana blunt based on its outward appearance. Again, the evidence is to the contrary.

Puhak testified extensively as to the basis for his belief that what he saw was a marijuana blunt. He testified that the blunt "did not appear to be factory made. It appeared to be handmade." (Tr. 35:25). He further testified that he had been trained to recognize marijuana blunts and, in fact, had seen them "many times" in his experience as a police officer. (Tr. 36:15-21; 121:4-11). Puhak, a longtime smoker of cigars himself, further testified as to the differences between the appearance of a factory-made cigar and a marijuana blunt, namely, that unlike marijuana blunts, factory-made cigars are uniform in appearance with an even circumference. (Tr. 36:22 to 37:11; 44:12-17). Puhak also testified that while a marijuana blunt looks "basically" like a cigar, it did look "different from a cigar." (Tr. 101:1-12).

Though defendant contends that this testimony is insufficient to show that it was immediately apparent to Puhak that he was looking at illegal contraband, it is important to reiterate that probable cause is not equivalent to certainty. *See United States v. Castellanos*, No. 08-12379, 2011 WL 2183720, at *9 (11th Cir. 6 June 2011) ("Probable cause does not require certainty; rather, it is a doctrine of 'reasonable probability.'"). As one court has noted, "[t]o satisfy the 'immediately apparent' standard [of the plain view doctrine], it is not necessary that a law enforcement officer know with certainty that an item is contraband or evidence of a crime." *United States v. Murphy*, 261 F.3d 741, 744 (8th Cir. 2001) (internal citations omitted). Rather, "[a] 'practical, nontechnical' probability that incriminating evidence is involved is all that is required." *See Brown*, 460 U.S. at 742.

13

The Supreme Court's holding and analysis in *Brown* is particularly relevant to this case. In that case, the Supreme Court upheld the seizure of a rubber balloon containing heroin from a vehicle that was stopped at a routine driver's license checkpoint. *Id*. at 739-44. As a basis for the Court's conclusion that the officer had probable cause for the seizure of the balloon as well as for the subsequent search of the vehicle, the Court cited the officer's testimony that "he was aware, both from his participation in previous narcotics arrests and from discussions with other officers, that balloons tied in the manner of the one possessed by [the defendant] were frequently used to carry narcotics." *Id*. at 742-43. The Court further reasoned that "[t]he fact that [the officer] could not see through the opaque fabric of the balloon is all but irrelevant: the distinctive character of the balloon itself spoke volumes as to its contents-particularly to the trained eye of the officer." *Id*. As in *Brown*, the court concludes that the testimony of Puhak regarding the recognition of the blunt as contraband is sufficient to support its seizure.

Defendant attempts to distinguish the ruling in *Brown* by asserting that while there is no alternative innocent explanation for carrying around a tied-off, un-inflated balloon, the appearance of the blunt in this case could suggest a lawful use. The court finds defendant's argument unpersuasive. To assert that the irregular appearance of the blunt, as described by Puhak, could have resulted from a person splitting open a factory-made cigar to remove the tobacco only to refill it again with tobacco or some other legal substance, seems as unlikely as using an un-inflated balloon to transport legal substances.

Other courts also have routinely found probable cause for the search of vehicles in which an officer views apparent contraband from outside of the vehicle. *See, e.g., United States v. Fladten*, 230 F.3d 1083, 1086 (8th Cir. 2000) (holding that police had probable cause to search a vehicle where they viewed through the vehicle's window an item commonly used in

14

manufacturing methamphetamine); *United States v. McKibben*, 928 F. Supp. 1479, 1481 (D.S.D. 1996) (holding that a warrantless search of an automobile was justified under the plain view doctrine where police officer observed cigarette rolling papers and marijuana roaches in the ashtray though the open window of the vehicle with a flashlight).

The court concludes that it was immediately apparent that a marijuana blunt was sitting in plain view on the center console of defendant's SUV prior to its being seized by Puhak. The third requirement of the plain view doctrine is therefore satisfied. All requirements of this exception to the warrant requirement having been met, the court finds that the seizure of the blunt was supported by probable cause and was valid without a warrant. Because the plain view doctrine justified the seizure of the blunt, defendant's contention that the seizure improperly exceeded the scope of the traffic stop is baseless.

Moreover, the presence of the blunt in the SUV provided probable cause for the subsequent warrantless searches of the SUV and defendant's person.[4] The search of the SUV was valid under the automobile exception to the warrant requirement. *See Maryland v. Dyson*, 527 U.S. 465, 467 (1999) ("'[A] search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained.'") (quoting *United States v. Ross*, 456 U.S. 798, 809 (1982)); *see also Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (per curiam) ("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more."). The search of defendant was valid under the incident-to-arrest exception. *See United*

---

[4] The government contends that other circumstances observed by Puhak also help establish probable cause, including defendant's lane changing and prompt exit from the highway, the position of his hands on the steering wheel, his nervous chatter, his repeated reentry into the SUV, and the smell of raw marijuana on the infant. Defendant disputes that at least some these circumstances can properly be deemed to be suspicious and otherwise to contribute to probable cause. The court need not address the materiality of these circumstances to the issue of probable cause because the discovery of the marijuana blunt, alone, was sufficient to provide probable cause to search the SUV and defendant's person.

15

*States. v. Flowers*, 173 Fed. Appx. 240, 242 (4th Cir. 2006) (holding that a police search of defendant's person was lawful as incident to his arrest following discovery of a large amount of money and drugs in vehicle in which he was a passenger). As with the seizure of the blunt, these justifications for the searches render meritless defendant's contention that they improperly exceeded the scope of the traffic stop.[5] Accordingly, this ground for defendant's suppression motion should be rejected.

## III. RACIAL PROFILING

### A. Applicable Law

The Fourth Circuit has recognized that "although an officer's 'motive[ ] for stopping an automobile that was violating traffic laws is irrelevant to the legitimacy of the stop under a Fourth Amendment analysis, . . . racially motivated law enforcement can violate the equal protection component of the Fifth Amendment's Due Process Clause.'" *Hammond*, 353 Fed. Appx. at 879 (quoting *United States v. Bullock*, 94 F.3d 896, 899 (4th Cir. 1996)); *see also United States v. Suarez*, 321 Fed. Appx. 302, 305 (2009) ("Allegations of racially motivated law enforcement implicate the Equal Protection Clause rather than the Fourth Amendment."). To establish a claim of racial profiling, "[t]he claimant must demonstrate that the [enforcement policy] had a discriminatory effect and that it was motivated by a discriminatory purpose . . . . To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted." *Hammond*, 353 Fed. Appx. at 879 (quoting *United States v. Armstrong*, 517 U.S. 456, 465 (1996)). "The standard for establishing a selective enforcement claim is 'demanding' and requires evidence that clearly contradicts the

---

[5] Defendant makes the additional argument that Puhak was required to confirm that the blunt did in fact contain marijuana before arresting defendant and proceeding with the searches of the SUV and defendant's person. But the presence of the blunt in the SUV without more provided Puhak probable cause to proceed as he did. The court declines defendant's invitation to engraft onto the probable cause requirement further investigatory obligations not presently recognized in the law.

16

presumption that officers have not violated equal protection." *Suarez*, 321 Fed. Appx. at 305 (quoting *Armstrong*, 517 U.S. at 463-65).

**B.     Analysis**

Defendant's argument that the traffic stop was unlawfully motivated by his race appears to be based solely on his contention that Puhak made a decision to stop the SUV after he observed that it was being driven by a black male. This naked contention is clearly inadequate to sustain defendant's claim.

More specifically, defendant has failed to put forth any evidence that similarly situated individuals of a different race were not stopped by Puhak. *See Hammond*, 353 Fed. Appx. at 879 ("To establish a discriminatory effect in a race case, the claimant *must* show that similarly situated individuals of a different race were not prosecuted." (emphasis added)). Nor has he directed the court to any other evidence that would support his allegation of discriminatory motive.

At the same time, the record contains evidence tending to negate defendant's contention of racial motivation for the traffic stop. For example, Puhak testified that he decided to begin his pursuit of defendant's vehicle "because there was a sudden change of lane and the vehicle then started riding very closely to a smaller SUV in front of it." (Tr. 22:11-14). As he explained, such a move by a driver in response to seeing a marked police car can be an indication that a driver is doing something wrong and attempting to "blend in" with other vehicles. (Tr. 11:7-14). After Puhak began his pursuit of defendant, he pulled up alongside the vehicle to make certain pre-stop observations to help assure that a safe traffic stop could be executed. In particular, Puhak stated that he would want to know if there were any children in the car because if "that vehicle decides to flee, that factors into whether we chase it or not." (Tr. 116:19-23). Thus, the

17

actions of Puhak in initially pursuing defendant and pulling up alongside him are readily explicable as part of routine procedures not associated in any way with the race of the driver.

Defendant also points to certain actions by defendant that Puhak characterized as indicators of suspicious behavior, such as defendant's failure to make eye contact with Puhak and his placement of his hands on the steering wheel at the "10 and 2" position, but which defendant contends are "perfectly legal and even desirable." (Supp. Mem. 10). Defendant contends that Puhak's alleged reliance on such conduct is pretextual and supports the notion that race was the real basis for the traffic stop.

But the courts recognize that reasonable suspicion of illegal activity can arise from conduct that is not itself illegal. *See United States v. Perkins*, 363 F.3d 317, 328 (4th Cir. 2004). Moreover, the notion that Puhak needed such purported indicators of suspicious activity to justify his stop of defendant is baseless because, as discussed, his observation of defendant committing a traffic violation gave him probable cause for the stop. *See Ohangbon*, 2011 WL 2356781, at *1 (noting that a traffic stop is permissible "if the officer has *either* probable cause to believe a traffic violation has occurred *or* a reasonable suspicion of unlawful conduct" (internal citations omitted, emphasis added)).

The court concludes that defendant has failed to meet the "demanding" standard for a racial profiling claim. *Suarez*, 321 Fed. Appx. at 305. Accordingly, this final basis for defendant's motion to dismiss should also be rejected. All bases for defendant's motion having been shown to be wanting, defendant's motion should be denied.

## **CONCLUSION**

For the foregoing reasons, it is RECOMMENDED that defendant's motion to suppress (D.E. 20) be DENIED.

IT IS ORDERED that the Clerk send copies of this Memorandum and Recommendation to counsel for the respective parties, who have 14 days or such other period as the court may direct in which to file written objections. Failure to file timely written objections bars an aggrieved party from receiving a de novo review by the District Judge on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Judge.

SO ORDERED, this the 19th day of July 2011.

_____
James E. Gates
United States Magistrate Judge